Good morning. Illinois Appellate Court First District Court is now in session. The Third Division. The Honorable Justice Nathaniel House presiding. Case number 1-9-0191 People v. Paul Schreiner. Good morning. This case is being heard via Zoom due to the COVID crisis. Would the attorneys who are going to make a presentation today please state their names and the parties they represent. Good morning, Justices. My name is Craig Ettinger and I represent the appellant Paul Schreiner. Good morning, Your Honors. Christine Cook on behalf of the people. Good morning. My name is Nathaniel House. I'm a judge on the appellate court and presiding over this case with me are Justices Margaret McBride and David Ellis. We're going to proceed as follows today. We're going to allow each side in turn to have 10 minutes of uninterrupted presentation and that will be followed by questions from the panel. The appellant may reserve a few minutes for rebuttal at which time the judges may ask questions of either party. Does anyone have any questions about how we're going to proceed today? No, sir. Okay, very well then. Mr. Ettinger, when you're ready to proceed, you may go ahead. Thank you, Justice. May it please the court. Justices, there are three simple issues in this case. The first issue is whether or not the at issue Franklin Park police officers violated Mr. Schreiner's Fourth Amendment rights by intruding onto his curtilage in order to gather more evidence to determine whether or not he was driving a blue Mazda at an intersection where an accident occurred. The second issue is whether or not there was consent that was given by Mr. Schreiner, Mr. Schreiner's wife, Mr. Schreiner's wife, where police officers were knocking on the door incessantly and then they gained entry into the home without any consent. And the third issue is whether or not the evidence should have been suppressed. Now, the first issue is the Florida versus Jardina's justices. The circumstances in the case at hand involves a hit and run accident that occurred at Oak and Grand Avenue, where in the suppression testimony, Officer Sergeant Jones testified that he received a dispatch at 11, 12 p.m. He was dispatched to the scene and then he what it looked like to be an accident. And he also saw what it looked like to be debris, oil, and a left blue Mazda headlight at the scene. Now, we later found out that officers had traveled from that scene to Mr. Schreiner's house by following the oil trail. And those officers first arrived at the garage, which is the curtilage of Mr. Schreiner's home. And they saw that there was oil spill coming from the garage. Now, they were trying to identify who was the so the officers, one officer jumped over the fence onto Mr. Schreiner's property. They came up to the front door without a warrant. And they, they went to and one of the officers, he continued to pound at 11 o'clock at night, 1130 approximately, he continued about paying bang on the door multiple times, ring the doorbell multiple times while flashing lights in the house. And Florida versus Jardina's is violated in this case, because there's no other conclusion to make that the officers here were there to gather evidence while trespassing out of the property. And people versus Florida versus Jardina's makes it clear that no nighttime visitors should be allowed. People versus Frederick in the Supreme Court of Michigan agrees with this that the knock and announce rule, the implied license rule in Jardina's is time sensitive. United States versus Jerez basically states the same thing, where there were officers knocking on the door very late at 11 o'clock, and there was another officer knocking on a motel window to await a sleeping occupant who was awakened while he was still in his underwear. And Collins versus Virginia even even reaffirms the fact that the test announced in Jardina's is what it is that the that that there is no knock, there are no nighttime knock visits in the middle of the night. Now as the second issue on consent, this issue is somewhat subsumed under the same facts as to the first issue. Now, the state in their brief, they attempt to say that this is a they don't try to say that this is invalid consent, but they say they try to cherry pick what the defense argues as to Mr. Mr. Schreiner being seized at the door, and they use an inapplicable case United States versus Virginia, and that case involved a lit a defendant in public who was arrested, whereas we're dealing with the home, which is the first among equals. So the incessant pounding, banging and ringing the doorbell at 11 o'clock at night, Mrs. Schreiner felt that she had no other choice but to open the door for the officers. So she did open the door. And then the officers asked her first, do you own a blue Mazda? And then one of the officers comes back down from the porch tells Officer Sergeant Jones that this case is this case is done. And Officer Jones wasn't sure whether or not it was. So then, after that occurred, Mr. Schreiner was asked to go retrieve her driver's license from inside the home. She didn't tell anyone she didn't give anyone permission at that time to enter the police officers did not have a warrant. They didn't have a warrant. They didn't have permission to be on the cartilage. What happened was Mr. Schreiner went to retrieve her driver's license. So this is like people versus boss, where the defendant there just took a step back into his home. And the court found that there was no consent there. And in this case, it's the same thing. Mr. Schreiner took a step back when to go retrieve her license. And she was she felt that she was compelled to open the door based upon a show of official authority. And she the trial court was incorrect in holding that Mr. Schreiner acquiesced in or did consent of letting the officers in the trial court held that held the dictate under Anthony held that there was no consent because of official because she did acquiesce in consenting of letting the officers in but the trial court reached the opposite result of what people versus Anthony Anthony holds but uses the same reasoning. Now. This is why justices that you should find in favor of the defendant. Our prayer for relief is that we pray that you you honorable justices reverse Mr. Schreiner's conviction and suppress the evidence pursuant to one son. And to add one more point, the state had the burden to make it unmistakably clear that the ambiguous gesture of Mrs. Schreiner holding her hands up in the air was not not consent that was extracted from her but instead it was actual consent. So it is for these reasons and the reason stated in the briefs that we pray that you find in favor of Mr. Schreiner. Thank you. Um, Justice Ellis, do you have any questions? Uh, I do. Thank you, Justice House. Just a few. Mr. Ettinger. Good morning. Morning. Um, uh, you know, we sometimes see cases where officers knock on a door at 3 a.m. or 2 a.m. and we say, wow, that's that's not what a normal person would be doing. But in a situation like this, the officers are hotly tracking evidence. There's just been an accident within sounds like maybe far less than an hour, probably more like a matter of a few minutes. They traveled approximately a block and a half following this trail and are at the door. Um, this is not a knock in the middle of the night. It's late, yes, but they wouldn't the officers have reason to believe based on the circumstantial evidence that whoever had been driving that car was now home and probably might very well still be awake. Doesn't that speak to the reasonableness of the time of night that they're knocking on the door? Justice, respectfully, I don't think so, because, um, that would defeat the whole purpose of having a defendant be able to retreat into his home. That's what Collins versus Virginia was concerned about as well as its progeny and people versus burns. Now, the state didn't raise this argument in the trial court nor in their briefs. So this argument's been forfeited by them. But nonetheless, um, a knock and talk. It's it's still not reasonable. And I know that your honor is trying to assert whether or not it's hot pursuit. But I do have a case as to that. And that's people versus Santoli in 2014. It's mirrors the same circumstances here. Police officers warrantlessly entered into the defendant's home. And this was in response to a hit and run. The defendant was not fleeing the police when she left the scene. The officers did not witness the incident and had not attempted to trap him. But instead, we're simply responding to a call from a police dispatcher. That's the that's the mirror image of the circumstances here. Well, I wasn't necessarily referring to hot pursuit, per se. Because I agree that you can go into your home. But simply that whatever time of night it was sometime after 11, but I believe it was before midnight, it was very close in time to when a car that seemed to drive into that garage into that house had just been part of an accident. And so doesn't that factor in to the reasonableness of the police officers actions? Wouldn't an objectively reasonable officer think there's probably a real good chance that whoever was just involved in a hit and run is inside that house and probably hasn't gone to bed yet? I understand your point, Justice. But at the same time, the officers here could have secured a warrant. Warrants are very easy to get these days. And they could have they could have gotten that and they could have done it with the proper authority because and but they didn't have probable cause at that time. They didn't know who was the driver of the car. That's why they went on the house to search for that in the state even concedes that that they were trying to search evidence to determine who was the owner of the car. Okay, so so let me let me take you to your your your final argument, your final request, which is suppression. Normally, if we find a fourth, if a trial judge finds a Fourth Amendment violation, if the trial judge agreed with your position on appeal and said, okay, we had a warrantless entry, and we had no voluntary consent, no claim of exigent circumstances. At that point, the judge would say, I think, tell me if you disagree that the search was per se unreasonable under the Fourth Amendment. And suppression then looms large. But suppression isn't an automatic remedy at that point, is it? I mean, doesn't the state get the opportunity? I mean, you mentioned Wong Son, doesn't Wong Son tell us that the state has an opportunity to argue attenuation or other exceptions to the suppression remedy? That's correct, Judge. That's what that that's what the case holds. But it doesn't apply here. The state did not argue in their briefs. And if you exploit a Fourth Amendment violation to gather evidence, that evidence is suppressed. And that's what happened here. They exploited the fact that well, well, I mean, that's that's your position. And, you know, it's a colorable one. But, but, you know, there was a bunch of different evidence used here at various stages following the entry, including leaving the house going into the garage. And, you know, the attenuation doctrine does recognize sometimes even if you have an invalid entry, that other circumstances can be sufficient to attenuate the initial taint of the illegal search from the evidence gathered. I think here didn't the defendant also make an incriminating statement at the police station? I believe so, Justice, but at the same time, the entire home plus the occupants were seized throughout that time. Okay, but is it your position that if the state had an attenuation argument, they had to make it right then and there? They had to make it within their briefs, Judge, or at the trial court level in front of the judge there? Well, I'm really talking about the trial court level here. Now at the trial court, they won. So they didn't need to. They carry the burden of proof on attenuation, but they didn't have any burden to carry because the trial judge agreed with them. It's not their fault that the trial judge agreed with them. If we agreed with you that there was a legal entry here, an unreasonable search under the Fourth Amendment, wouldn't we, at that point, remand it for an attenuation hearing? That could happen, Judge. That would be fine. And then if we did that, what would we do with the trial? Would we reverse the conviction or would we simply say, well, let's first see what the trial judge thinks about the attenuation? I mean, hypothetically, just hypothetically, the judge might say, I think all this evidence comes in anyways. What would be the need for a new trial if that was the judge's ruling? Well, I think that we would first need to determine whether or not the attenuation is proper or not. And then, you know, depending on what that ruling is, the conviction should be reversed. So then Mr. Schreiner has a chance to put on his own evidence and not have this tainted evidence come in and we'll determine whether or not it's tainted or not. So we should reverse the conviction under that reasoning. Okay. All right. Thank you very much. Thank you. Thank you, Justice. Justice McBride, do you have any questions? Yes. Mr. Ettinger, you mentioned a case, Santori? Santobi. Santobi. Was that cited in your reply brief? No, Justice, but it was in response to the question. I thought it was hot pursuit. All right. Is it a hot pursuit case or is it a case? Well, you said it would be supportive here because they went to the house. What's the site? Let me just get that from you. Okay. People versus Santobi, 2014, ILAP 3D, 130075. 130075. All right. Okay. So when did the other squad cars show up? I believe, Justice, that there were two squad cars already at the scene before Officer Michael Jones arrived there. Okay. But then weren't there a number of other squads that showed up to where the garage was? Yes. When was that? Were there a lot of squads right away or were there two to start and then another two or three? I believe that there were two to start and then when Officer or Sergeant Jones arrived, it was after he received an 11, 12 p.m. dispatch, and then there were a total of six cars that came at some point in time. The record is not clear at what time approximately they all arrived, but that was the end result. Is there a possibility, you indicated that the police found what was a blue headlight from a blue Mazda at the scene? Correct. And the other, was this an accident involving another car or was it, you know, damaging property and then I thought it involved another vehicle. Did it or no? I thought it did, Justice. Yeah. Okay. All right. Well, what about this fact that, isn't it possible because of this blue Mazda headlight and the trail that went to this house that all of this would have eventually been discovered, inevitable discovery? I don't think so. It's possible, isn't it? It's possible that it would be discovered. I mean, but the main issue is whether or not who drove the Mazda and whether or not that was the Mazda at the scene. The officer didn't know that at the time of when they intruded onto the curtilage. All right. Going back just to what Justice Ellis mentioned about, you know, this was not the middle of the night. This was, it was about 11 o'clock as I think the record indicates. And the judge in this case made some findings. We kind of review those for a manifest way, don't we? Yes. Didn't he say that, you know, they were investigating what appeared to be a hit and run, that there was debris, oil, and the headlight leading to this particular garage. And didn't the judge find that it was reasonable for the officers to go to the home to at least investigate? Well, they could have gotten a warrant to go and intrude onto the curtilage, Judge, but they could. And if they're on the public thoroughfares, that's fine. They could have gone through the public thoroughfares and on the sidewalks and peered into the home. That's fine. But they can't use a special device or anything. No, I understand that. But you said they didn't have probable cause to get a warrant, but then you're saying they needed to get a warrant. But let me talk to you about, don't they have the right to, are you suggesting that, let's say it's eight o'clock, are you suggesting that they couldn't go to the door and knock at all? No, I'm not suggesting at eight o'clock. There's no bright line rule, but it's not reasonable for anyone to expect a visitor at the night. And that's what Justice Scalia honed in on in Florida versus Jardina is that it's not the use of the dog that was a problem in that case. It was the kind of behavior that was used. No one wants anyone snooping on their porch at any hour of the trying to get the occupants to the door. So I'm not sure that there's a problem with them knocking on the door. But I agree with you that the real issue here is whether or not the occupants consented. And you believe that the state is arguing that her putting her arms up in the air was consensual behavior? No, I'm saying that it's not, Justice. No, I know you're saying it's not. But is that what you think they're banking their argument on that when she raised her arms up, she was letting the officers in the house? Is that? No, I don't think that. No, no, I know you don't think that. But is that? Is that what you think the state is going to argue that when she raised her arms, she was saying, Come on in or something like that? Well, they would have to show that it's unmistakably clear that she was letting them in and they didn't sustain that burden. So I'm not sure exactly what the state. Okay, okay. But you, you clearly would argue that raising your arms isn't really suggesting anything. I mean, what is that suggesting? I'm not sure. It's a single ambiguous, ambiguous gesture, my apologies, and people versus Anthony of 2001. The Illinois Supreme Court case I talked about, it requires that the state prove that consent was given not extracted. And they have to make it unmistakably clear. All right. And the two officers that could have told us something about this. The ones that actually went in, they are not. There's no nowhere to be seen. They're not in the record. They never testified, even at the later trial. Right? Yes. That's correct. All right. I don't have any other questions. Thank you, Mr. Edger. Thank you. I don't have any questions. It's been covered adequately by my colleagues. Ms. Cook, you may proceed when you're ready. Thank you. May it please the court, counsel. The evidence in this case is my interpretation and the evidence in the record is quite contrary to what has just been represented by counsel. Nobody jumped over a fence. Counsel said something about the police officers jumping over a fence. I don't know if he's confusing that with another case. There's no fence in this case. Nobody jumped over anything. There's no evidence, no credible evidence that the officers were continuing and relentlessly pounding on the door. The evidence in this case show that the two officers that did go up onto the porch initially rang a doorbell or Julie claimed they rang the doorbell. They claimed they knocked one, two, three times. It's not incessant banging. That's knocking on a door in a proper knock and talk in order to investigate, as Justice Ellis said, a hotly tracked accident that had happened literally minutes before. They were not continuing to pound. They were not flashing lights in the house. Those arguments all ignore the trial court's finding of facts in this case as to why Julie opened the door. Julie opened the door and when she opened the screen door, the storm door, she immediately said, it was me. I did it. I'm sorry. I panicked. Well, that coupled with opening up the door is obviously a very good sign of tacit consent to enter that house. Both of the officers did not enter the house. Only one officer entered the house with her in order to secure her driver's license in order to complete a crash report. The other officer walked back to the street where Sgt. Jones was smoking a cigarette and he's like, we got this all solved. She confessed. Sgt. Jones aptly pointed out to a young officer, there's no way that woman was driving. She's in her robe and slippers. That accident happened just minutes ago. This isn't right. That's when Sgt. Jones then went into the house. When he entered the house, he testified that one of the other officers had Julie's driver's license in his hand and he was writing out the report. This evidence also suggests and the record affirmatively establishes that at that point, Sgt. Jones said to Julie, Julie, we know you weren't the driver. Somebody else in the house. She started crying. She's like, I'm so tired of this. They found that the defendant was still in the home. Sgt. Jones then asked Julie, could you go get him? He didn't store him into a bedroom. Nobody's displaying guns. There's no aggressive conduct whatsoever. They were there and they knocked on the door as at every right and obligation to do as this accident had just happened. Julie clearly let them into the house. It wasn't acquiescence. It was consent when she admitted that she was initially the driver of the car and had left that scene without reporting it. That also gave the officers probable cause, coupled with some exigent circumstances to enter that house. So then when Julie came back, she said she couldn't awaken the defendant. And then Sgt. Jones said, do you want, you know, is it okay if I go back there and I try to get him? And she said, yes, more consent. Julie and Sgt. Jones then went back into the rear bedroom where the defendant was pretending to sleep, but he had the covers pulled up over his head. And the sergeant said, you know, Paul, get out of bed. You need to get dressed. You know, were you the one that was driving? And he said, yes. And everything kind of flowed from there. The officers asked to see the car. They asked the Shriners to take them to the garage and the Shriners did. There was no show of threat. This was a properly conducted investigation, literally minutes after it happened. We also know from the evidence from defendants own testimony at the motion that Julie was not asleep. She was watching TV minutes earlier when he came home and said, I got into an accident and I didn't report it. She was nervous and scared. The trial court found as a matter of fact, because she was aware of this information, she knew the police were coming. And when they did, of course she was nervous and scared. But when she opened that screen door and just shout it, it was me. I'm sorry. I left. I panicked that provided the officers with everything they needed. This was not an ambiguous gesture. There was not a single case cited by the defendant and his brief down at the trial at the motion to reconsider, or even on appeal that has any kind of facts that warrant analogous findings in this case for a fourth amendment violation. The fourth amendment was never implicated in this case. The officers properly calmly did their job. Julie originally admitted when she first opened the door, she was the driver and had committed an offense. She allowed officers in. She consented to those officers coming in, not only by her statement, but of her subsequent actions clearly showed that that was a consent. There's no ambiguous gesture in this case. There was no search like Florida versus Jardines or Jerez or anything like that. The officer is simply and lawfully at that door minutes after this accident, the officers acted most reasonably for the circumstances of that night. And as far as any remedy would be concerned, justice Ellis, as you properly noted, even if this court found that there was a fourth amendment violation, it's not a reversal of the defendant's conviction. That would be the proper remedy at best. He would get a remand or we would be allowed to remand for an attenuation hearing. I would also like to further note that while defendant claims that we have waived all kinds of arguments, uh, the reality is this record is pretty complete with the fact that we did argue that there was probable cause when Julie answered the door. We also argued exigent circumstances below. Um, and I would like to note that it looks like our brief, uh, may have been, um, missing a paragraph. It looks to me from the closing paragraph, uh, we asked that this court or note that this court can affirm on any basis in the record. And then it just ends, uh, for, I apologize for it appearing that the wrong edition, it looks like a further paragraph tying that up regarding probable cause and exigent circumstances should have been written in the brief. And it was not, uh, of course, any forfeiture would be binding on the people and not on this court. That was the paragraph in there. There is no case law. There is no facts in this case that would allow for fourth amendment violation to be found by this court. And the people respectfully request that this court from the trial courts, denial of the motion. Thank you. Uh, justice Ellis, do you have any questions? Um, I do have a few good morning. Um, Ms. Cook, tell me that your name is Ms. Cook but I answered to a lot of things. So you've been with us many times. We love having you. I'm sorry. I'm just, I guess I'm getting older COVID brain or something. Um, okay. Um, is probable cause enough to enter a home? No. Well, you also would need some exigent circumstances or voluntary consent, right? Consent takes us out of the whole fourth amendment. Sure. So when Julie throws her um, I would certainly agree. I don't, it'd be hard to disagree that there would have been probable cause to arrest her, but that still wouldn't give the officers the right to enter the home, right? Not without her consent. Okay. So if, if, if the police come to my door and they say, Mr. Ellis, last night, did you, uh, rob a, uh, you know, uh, an ATM? And I say, yes, I did. I did. I admit it. I'm guilty. And they say, can we come in? And I say, no, they can't come in. Right. They have to go get a warrant. I agree. So why is Julie admitting, albeit falsely, we now know admitting her guilt that does not give the police the right you're, you're, you're, I think you're, I think you're skipping a step here. Her throwing her hands up saying I did it is showing cooperation. It is possibly admitting it is admitting guilt. It's probably giving probable cause, but how can that also be a tacit consent to come on into the house without anything further from her? Right? Well, that action and her holding the door open, allowing the officer, and of course this would have been a lot easier had we called the two officers on the porch. Um, but, uh, Sergeant Jones's testimony was sufficient. Um, the evidence was that, you know, she admits I'm at, I'm at, and then the door is held open and the officer is in, but I would also note that her subsequent conduct is also, um, plenty of that she provided and voluntarily gave consent for those officers to be in there by admitting she was apologizing. She's clearly surrendering herself to having a ticket written. Um, those are actions and inferences from those actions that allowed that consent finding to be found by the trial court. Things that happened after the police came in is you can be relied on to the fact that she gave that she provided consent and then that it was voluntary because she was clearly cooperating with the police as the trial court found. But if we're talking about nonverbal consent, which I don't want to put words in your mouth, but I think that's what you're saying here. I mean, our Supreme court has said, and I heard it from your opposing counsel. It's got to be unmistakably clear where, what evidence do we have in the record of unmistakably clear, nonverbal consent? We have an officer 50 feet away, 40, 50 feet away. Right. Who, you know, the, the, the prosecutors did try to pin him down a little bit about what happened at that door, but he didn't say anything. I mean, yes, she had, she held the door open to speak with them, right? She's got a glass. I don't know how much was glass and how much was screen, but she opened the door to speak with them, but that's not letting him in. She's talking to him, but she wasn't just talking to them. She was admitting, yes, it was me. I'm so sorry. And the court said that I understand. I was, I would like a lot more evidence too, because all we have is that interaction with her apologizing to the officers. The apology is sufficient evidence of her consenting. She is by doing that availing herself of those police to come in. She's cooperating with the police. I would like more evidence as well. My argument is that was sufficient evidence for consent, voluntary giving consent. Okay. Um, I understand your position. I, I wish the record was clearer too. Yeah. I'm not sure why the, I can only assume those police officers were not in the courtroom and they couldn't be found or something. I mean, they didn't ask for a continuance. I mean, they could have done. No. Um, yeah, it's troubling. I mean, it, you know, our, our, our issue here, we clearly have an issue here and it's, it really speaks to me of just a failure of proof, not an indictment of police conduct because, you know, I'm just not sure we have much of a picture of what happened here. Um, it could very well be that the police who were there, I had Guli and Velasquez, they may have gotten her consent and may have testified had they shown up, but, um, we, we have the record. We have right. Let me, let me, let me ask you about the, the, the, the possible dispositions of this case. Um, I think you, um, we're saying that if, if, if we did find a fourth amendment violation, you were entitled to an attenuation here. Yes. So it's your position that the state did not have to bring attenuation forward on the front end in anticipation of possible loss. Right. Um, if we remanded for an attenuation hearing, what do we do with the trial? What do we do with the conviction? There is, of course, if we're sending it back for an attenuation hearing, we don't know what the trial judge is going to do. Correct. He might say it all comes in. Uh, he might say some of it there was a fourth amendment violation. Do we, do we let the trial judge decide whether the conviction should be overturned? Unfortunately, because I've been doing this for so long, I've lost a couple of fourth amendment hearings and this court has remanded for attenuation hearings. Uh, typically it's usually done a remanding to the trial court for an attenuation hearing. And if attenuation is found, um, you know, to affirm the conviction, if attenuation is not found, you know, it depends on what the court finds down below. And I, you know, we can't speculate as to what that would be at this juncture. Okay. Ms. Cook, thank you very much. Thank you. Uh, justice McBride, do you have any questions? Yes, I do. So, um, I, I have to ask a question. In this particular case, um, Mrs. Schneider said specifically, I did not give the police consent to come in. Do you recall that? Yes. Mr. Schreiner also echoed those words. I did not give the police consent. True. That's what they testified to. Correct. Okay. There's no testimony in this record from anyone other than the Shriners regarding the actual issue of whether or not they were, that the officers were given consent. Right. How can the trial courts find it? Well, the court found as I haven't, I haven't asked the question. Oh, I'm sorry. I'm sorry. What evidence now? I don't, I don't want to hear. I admit it. And, uh, I did it. I'm so sorry. I'm not interested in that about, you know, whether that was her consenting. Okay. But there is not a single officer, including, uh, the super senior, uh, were given consent. Did he? No. Okay. So we base our decisions. When we look at, at the evidence to determine whether the court manifestly aired in making a finding, we have to base that on the evidence that was testified to don't we? Right. So as far as actual words, there is no evidence in this record from any witness that at any time, Mrs. Shriner or her husband said you can come in or were even asked, may we come in? Is that true? True. All right. Now, uh, you're saying now that your brief didn't have exigent circumstances, but it should have. I'm saying that that was a possibility. We argued it below. Okay. At the, at the, at the hearing before the judge? Yes. Uh, we argued exigent circumstances. I believe in the motion to reconsider, uh, we said, uh, the search was either voluntary based on how pursued or exigent circumstances on the record at page 10. All right. But you didn't mention that at all in your right here. Okay. Now, um, I do want to know what case do you possibly have to tell us for support your suggestion that an apology and a person holding a door means that they have given consent? Oh, there's no, I couldn't find any factual case because the facts in this case are a little bizarre. I couldn't find a factual case for that support. Mine is more of a logical, uh, conclusion based on those unique facts. All right. But we can't really base our decision on a, on some kind of a conclusion you're making. Uh, I mean, is there any case that you've ever read where it says that a, an admission at a doorway somehow is consensual behavior to let somebody go in your house? No. And is there any case that you have to support today that when a person answers the door to police and, you know, natural thing to do is hold the door. It's her door. Okay. Is there any case that you can cite to us that says holding a door is consent to come in your house? No, not those things separately, but those are her gestures together. All right. That's what the court found. No, I'm not sure. Yeah. I I've, I've read the findings, but, uh, I don't know of any case. You haven't cited a single case that would suggest that's that when someone answers their door at 11 o'clock at night, hold the door open. And they say, I just committed a crime that that is consent to come in and secure evidence. I'm not, I'm not aware of any case. And you haven't supplied us with one. Have you not for consent? No. Okay. Well, isn't that the issue here? The trial judge found that she acquiesced, that she wanted to help the police. You wanted to cooperate. So she just let them in and that was her consent. Right. And he said acquiesced. And then he said, consented. Yes. That's what the court found based on. She wanted to cooperate with the police. It does have to be based on some case authority, doesn't it? Well, I can't find any because the facts here are a little unusual, but her, her obvious desire to cooperate with the police coupled with her admission supports the notion that she allowed those officers into her house consensually. Okay. But without any, without any precedent that I've been able to find throughout the country. Okay. And then you agree. Let's just briefly talk about attenuation. Do you have any thoughts about what could possibly be attenuation here? Oh, sure. There's several factors regarding the attenuation that could be argued. You know, the fact that the crime had just happened, the number of officers, there were really originally only two officers that just knocked on the door. Jones was on the street. Julie testified that, you know, there were three although the crime isn't of course like a crime. Isn't attenuation something that occurs post? Not before? Attenuation occurs later. Right. So that's why that's what I was asking about. What do you want to talk about the attenuation? I mean, you can't attenuate something by going backward. You go forward. For attenuation, you know, it's hard for me to argue attenuation because we didn't elicit that kind of evidence. All right. One thing you do agree though, if we agree with the defendant here that the motion to suppress was improperly granted and we reverse that finding, you agree that the appropriate avenue to pursue here is to remand for an attenuation hearing. And I believe there are some cases where this court has specifically sent it back. And in our finding, our remand order, we say that if the court finds that attenuating circumstances that would break the chain so that some evidence could be admitted, then the conviction stands. However, if the court finds that, you know, there aren't facts suggesting attenuation, then, you know, the state would still have the opportunity to present evidence at a trial, I suppose. Would you agree? Yeah. Yes. And there was some evidence that was before the knocking on the door. Yes. Okay. All right. I don't have any other questions. Yeah. Thank you, Justice. Going back to the remedy, is it possible on remand, if there is a remand in attenuation hearing, that the trial judge could rule that some of this evidence should be suppressed and some should not? At that point, what should happen at that point? Well, again, I'm arguing, I guess, on speculation. It depends on what the trial court is allowing and whether the trial court finds that it's dispositive or not. I mean, it's hard for me to answer those because I'm arguing in a theoretical vacuum. And I don't know what evidence we would be eliciting at that kind of a hearing. They basically engage in a stipulated bench trial with everything coming in. I'm just saying, if the trial judge says, well, this statement shouldn't come in, at that point, does the defendant get a new trial? He might. Who makes that decision? Well, I would originally think that the trial court would make that decision, depending on what is going to be possibly suppressed or not. And what is the standard that the judge is going to use in that case? For an attenuation hearing? I mean, standard would he use once he decides that some of the evidence should not come in? What standard would the trial judge use to determine whether or not the denial in regard to that evidence warrants a new trial for the defendant? Well, it depends on what's being allowed in or what's being suppressed. I mean, I can't, it's hard for me to answer this question because I don't know. I don't know. All right. All right. I don't have anything else. I just like to know, Justice McBride, Parker, I believe, is cited in the defendant's brief, People v. Parker. And Parker has a big string side of cases about consent being inferred from certain gestures. And there's some case law in there. I'm familiar with the case because I authored that opinion in 2000. Right. And Henderson, the defendant's mom, answered the door, confirmed he was home, and stepped inside and pointed to the defendant's bedroom. That was found to be voluntary consent. I don't have any case law that can be analogous to the facts in this case. It's just a very bizarre, factual circumstance. But again, it is the people's position that her opening the door and admitting and apologizing to the police was clearly her consent to voluntarily cooperate with the police, and that she allowed that was enough to find a consent below. And we would ask that this court affirm. Just pointing out, though, that no, we have two people here that said, I didn't, I specifically did not allow the officers in. So it's totally different from that other case. And the trial court did not and that's, you know, that's not against the manifest way to the evidence. That's our argument. Justice Ellis, anything else based on, you know, just one question, Justice House, if you please follow up on the question that Justice House just asked you. When he was asking you the standard, I think, I think what he was trying to get at is you're obviously correct that if this went back for an attenuation hearing, the trial judge would decide maybe, maybe the, you know, maybe the statement at the police station is sufficiently attenuated. So that comes in. But ultimately, in deciding what to do after he, let's, let's say it's a split verdict. And some of the things are out, some are in. What standard does he then employ to determine whether there should be a new trial? Does he determine whether enough of it got in that it was still enough to convict? Or does he say, well, this trial would have looked totally different. And so I should just start over. Like what is the what standard would he be using? What's the balancing procedure for this rule of law would guide his or her decision once they reach a split verdict on the attenuation? All right. Let's say half of the evidence is coming in. I think all the judge really has to do is determine if that evidence is sufficient to move forward to have a new trial. If there is any way that a guilty verdict could be compromised by the suppression of evidence, the defendant would certainly be entitled to a new trial based on that. I mean, you could also offer an opinion if you remand for an attenuate or for an attenuation hearing that, you know, you could also say if there's any suppression of the evidence that the court find that, you know, the guilty verdict could in any way be in question to order a new trial. Yeah. But under what circumstances would the judge say, no, we're OK. We're going to keep this conviction intact if he if he knocks out a couple of things, but but keeps in and he says that's probably enough to convict him anyways. Is that can he do that? Probably. I've argued an attenuation. I think it came back up on appeal three different times on a Fourth Amendment violation. I don't know, without knowing specifically what is being suppressed, it's difficult for me to answer a question like that. No, I completely appreciate that. I'm just trying to figure out under what standard he or she would be determining whether. Right. The first the original trial should be vacated and there should be a retrial. I off the top of my head, I can't come up with this rule of law that would guide that decision. Right. But I mean, certainly if if there is an attenuation finding to the defendant's blow coming in, even without a statement, but, you know, his his BAC coming in, that would be sufficient to sustain its guilty finding. OK. Yeah. OK. Thank you, counsel. Thank you. It's good. Mr. Edinger, you have to take a few minutes for rebuttal. Thank you, Justice House. Justices to cooperate with the police does not equal consent. It's not tacit consent. And as the opposing counsel has made clear, she would have liked a lot more evidence to come into the record. So she admits that it wasn't unmistakably clear that Mrs. Schrader gave the police consent to enter into her home. And as to attenuation, that wasn't in the trial court. And nonetheless, if there is attenuation here or if you want to remand it, Mr. Schrader sees throughout the encounter. And that's what my case law indicates as well. And like Justice McBride said, the state hasn't cited any case law in support of their position. And we have plenty of analogous cases like people versus Swanson, where the storm door was held open for by the answer of the door for a few minutes, and then she opened it slightly so she could hear what the police were saying. And then the police took advantage of that and walked right in. Although that's a more severe situation. Nonetheless, the main front door was breached when she went to go get her license. And it wasn't unmistakably clear that she gave any kind of consent. She didn't give any kind of consent throughout the entire time the police were there, nor after the fact. And as to what counsel argued about after the fact, what consent matters at the time of when the officers made the entry, not after the fact, we don't do 2020 hindsight here. That's not how the Fourth Amendment works. And to additionally help the attenuation argument for the defense. No Miranda rights were read throughout this entire time, where they were at the house. And the Miranda test is the same as being seized, whether or not someone was in custodial interrogation. She was in custody because she was seized. And they asked her whether or not she owned the blue Mazda that's asking her to make a criminal admission. And it's for that reason that the court should find in favor of the defense and not the state. In addition to the other reasons promulgated by me. All right. Thank you. Do either the justices have any questions based on what we just heard? All right, very well. This matter will be taken under advisement. The cases will argue very interesting issue, well briefed, and we'll take it under advisement and issue an order in due course. Thank you.